**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **John Doe,** | **:** | |
| | **:** | |
| **Plaintiff,** | **:** | |
| | **:** | **Case No.** |
| **v.** | **:** | |
| | **:** | **Judge** |
| **The Ohio State University,** | **:** | |
| | **:** | **JURY TRIAL** |
| **Defendant.** | **:** | **ENDORSED HEREON** |

## **COMPLAINT**

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

    a)   JD's Interactions with Dr. Strauss ............................................................. 3

    b)   "Appropriate Persons" at OSU Knew of Dr. Strauss's Predation and Did Nothing ......... 4

JURISDICTION AND VENUE ....................................................................................... 7

PARTIES ....................................................................................................................... 7

SPECIFIC FACTUAL ALLEGATIONS ......................................................................... 8

I.   JD and Dr. Strauss ................................................................................................. 8

    a)   Background .................................................................................................. 8

    b)   JD's Sexual Abuse by Dr. Strauss ........................................................... 10

    c)   The Gradual and Devastating Impact of Dr. Strauss's Abuse of JD ......... 11

    d)   JD Learns That Others at OSU Were Sexually Abused .............................. 13

II.   OSU Knowingly Employed a Serial Sexual Predator ......................................... 14

II.   OSU Knowingly Employed a Serial Sexual Predator ......................................... 16

III.   Dr. Strauss is Finally Investigated, But OSU Continues to Cover His Tracks and Enable Dr. Strauss's Sexual Abuse of OSU Students ......................................... 26

IV.   JD Did Not Know and Could Not Have Reasonably Discovered That Both Dr. Strauss's Sexual Abuse Was Widespread and that OSU Knew About It and Did Nothing ........................................................................................................... 28

CLAIMS FOR RELIEF .................................................................................................. 30

COUNT II ....................................................................................................................... 33

PRAYER FOR RELIEF .................................................................................................. 34

CERTIFICATE OF SERVICE ........................................................................................ 746

## **INTRODUCTION**

1.      This action is yet another example in a growing number of cases where institutions of higher learning retain physicians that turn out to be sexual predators. And, instead of protecting its students, the school—in this case The Ohio State University ("OSU")—ignores the sexual misconduct of its employee, fails to inform its students that a sexual predator (cloaked by the school as a health care professional) is in their midst, and ultimately covers up evidence of the sexual predation of which it was well-aware.

2.      In this specific action the sexual predator was Dr. Richard Strauss ("Dr. Strauss"), and the victim was John Doe ("JD").

3.      Dr. Strauss was hired by OSU in or about 1978 and worked as a physician and professor at OSU until in or about March of 1998.

4.      As early as 1978, OSU supervisors and administrators had knowledge of Dr. Strauss's sexual predation of OSU students, yet made absolutely no effort whatsoever to inform its students about, or protect its students from, Dr. Strauss until nearly twenty (20) years later.

5.      Indeed, as concluded in the *Governor's Working Group on Reviewing the Medical Board's Handling of the Investigation Involving Richard Strauss Report* (August 30, 2019) ("Governor's Medical Board Report"): "Despite multiple supervising and colleague physicians who were aware of complaints/rumors against [Dr.] Strauss as far back as 1979, no [OSU] physician reported any wrongdoing by [Dr.] Strauss to the State Medical Board of Ohio. More troubling, it appears the abuse was never reported to law enforcement by anyone at [OSU] or the Medical Board."[1] The Governor's Medical Board Report, a report of the Ohio Department of Public Safety investigating the administrators within its largest State educational institution (*i.e.*,

---

[1] *Id.*, at pg. 2.

OSU), found this to be an "astounding failure of anyone in a position of authority to come forward to initiate a Medical Board or criminal investigation into [Dr.] Strauss's conduct."[2]

6.     In OSU's most recent annual crime report to date (issued in December 2020), OSU disclosed that Dr. Strauss committed at least 127 rapes, and at least 2,201 other sexual assaults on OSU students and student-athletes during his employment at OSU.[3]   At these numbers, even calling it an "astounding failure" does not truly capture the horrors OSU beset upon its students through OSU's (i) hiring of Dr. Strauss without a meaningful background check, (ii) allowing Dr. Strauss to remain as a treating OSU physician after reports of his sexual assaults on students began to pour in during Dr. Strauss's very first year at OSU, (iii) enabling Dr. Strauss's sexual assaults to continue by taking no action against him even after at least scores of reports of Dr. Strauss's sexual abuse were received by OSU administrators, and (iv) covering up, making excuses for, and failing to report Dr. Strauss to law enforcement even after an OSU investigation itself concluded that Dr. Strauss was a sexual predator.

7.     Plaintiff herein, JD, attended OSU from 1985, at least six (6) years after OSU already knew of Dr. Strauss's sexual predation of students and student-athletes, until 1990.

8.     During his time at OSU, JD was a member and captain (1989) of the OSU Football Team.  Although Dr. Strauss occasionally gave physicals for the OSU Football Team, Dr. Strauss was not specifically assigned to the Team.  On the occasion where Dr. Strauss sexually abused and assaulted JD, however, it was indeed in the context of an OSU Football Team physical, which JD was directed to take from Dr. Strauss by OSU Football Team staff.

---

[2] *Id.*

[3] https://news.osu.edu/university-issues-annual-crime-report-reminds-community-of-safety-resources/ (last visited on July 20, 2021).

9. Until no earlier than 2018, JD had no idea that OSU was aware Dr. Strauss was a sexual predator—preying on OSU students and student-athletes—as early as 1978. Until no earlier than 2018, JD was entirely unaware of the massive scope of Dr. Strauss's sexual predation before, during, and after JD attended OSU. Until no earlier than 2018, did JD become aware that any other OSU students and student-athletes had been sexually abused and assaulted by Dr. Strauss.

**a)**     **JD's Interactions with Dr. Strauss**

10. JD was directed by OSU Football Team staff to visit Dr. Strauss for his annual physical in or about August 1986. JD had never visited Dr. Strauss for medical treatment and had never met him prior, in any context. Up to this point, JD had been a superstar athlete for most of his life and, thus, had experienced countless prior physicals.

11. When Dr. Strauss entered the exam room, he immediately instructed JD to drop his pants to the floor so that Dr. Strauss could do a "hernia check." JD complied. Immediately after JD dropped his pants, Dr. Strauss began manipulating, massaging, and fondling JD's penis. Dr. Strauss then used his second hand to hold and caress JD's testicles. This "exam" went on for several minutes.

12. JD, having had many hernia exams before, knew this was unusual and—concerned that something may be amiss physically—asked Dr. Strauss if "anything [was] wrong?" Dr. Strauss responded, "no, you're OK." Notwithstanding Dr. Strauss's response, Dr. Strauss continued to manipulate, caress, and fondle JD's genitalia for several more minutes.

13. As Dr. Strauss continued to *examine* JD, JD came to realize that Dr. Strauss was sexually abusing him. It was clear to JD that Dr. Strauss was enjoying the session and may have even become sexually aroused during the session. JD was too embarrassed and ashamed, however, to confront Dr. Strauss. JD was also concerned that—given this was an OSU mandated physical

being administered by an OSU Athletics Department doctor—if JD had reacted verbally or physically toward Dr. Strauss, JD would be risking his place on the OSU Football Team and his athletic scholarship. Despite towering over Dr. Strauss at 6'2" and 220lbs., JD was frozen in place by Dr. Strauss's conduct—feeling helpless and entirely unsure of what to do—except to let Dr. Strauss finish the *exam* so that JD could get out of the room and away from Dr. Strauss as soon as possible.

14. After the exam, knowing that Dr. Strauss had sexually abused him, JD was mortified, deeply ashamed of himself, and embarrassed.

15. JD approached William "Billy" Hill, the Head Athletic Trainer for the OSU Football Team at the time, asking "Dr. Strauss, what is this guy doing?" Hill responded by simply nodding his head and saying, "it's not up to me." JD was not exactly sure what that meant, and not wanting to discuss the specific details of his abuse, JD left Hill's office and never spoke of the matter again with anyone at OSU.

16. Until recently, JD told no one else—except for his wife and his parents—of this incident. Until 2018, when the Perkins Coie LLP ("Perkins Coie") investigation was publicly announced, JD was entirely unaware that other OSU students and student-athletes had been sexually abused by Dr. Strauss.

b) **"Appropriate Persons" at OSU Knew of Dr. Strauss's Predation and Did Nothing**

17. In or about April 2018, the law firm of Perkins Coie began an "independent investigation" into the alleged sexual misconduct of Dr. Strauss during his employment at OSU. In or about May 2019, Perkins Coie publicly released its report.[4] The Perkins Coie Report publicly

---

[4] *See* Perkins Coie LLP, *Report of the Independent Investigation, Sexual Abuse Committed by Dr. Richard Strauss at The Ohio State University*, May 15, 2019, (hereinafter "Perkins Coie Report").

and indisputably revealed—for the first time—that many OSU employees and officials ("appropriate persons" under operative law) received scores of credible reports that Dr. Strauss was sexually assaulting students throughout his career as an OSU employee and athletic team physician, but that OSU failed to take any action in removing Dr. Strauss from his position, report him to the proper authorities, nor do anything to inform or protect OSU students from Dr. Strauss.

18.     Due to OSU's inexcusable failures and cover-up of Dr. Strauss's sexual predatory conduct—which began no later than 1979 and fully revealed only in 2019—OSU's conduct resulted in OSU students and student-athletes being repeatedly, *inter alia*, (i) anally raped; (ii) sodomized; (iii) digitally penetrated for no medical purpose; (iv) had their genitals inspected, rubbed, and massaged for no medical purpose; and, (v) subjected to psychological distress during exams while Dr. Strauss inappropriately touched them for no purpose other than for Dr. Strauss's perverted sexual gratification.

19.     As shocking as Dr. Strauss's criminal conduct set upon OSU students and student-athletes is, OSU's complicity by ignoring, enabling, and covering up Dr. Strauss's conduct is equally appalling given that OSU, its administrators, and its staff were supposed to—and in fact were legally obligated to—protect OSU's young and vulnerable student body from these horrors.

20.     Indeed, despite receiving numerous credible reports of Dr. Strauss's sexual abuse of OSU students and student-athletes by no later than 1979 (and then no less than hundreds of reports as the years past), OSU continued to employ Dr. Strauss, appointed him as the official team doctor of numerous varsity sports and to the Clinic—thereby permitting him to examine and treat students and student-athletes unchaperoned and behind closed doors—and failed to take any

reasonable steps whatsoever to prevent Dr. Strauss from sexually assaulting OSU students, until at least 1996.[5]

21. As the Perkins Coie Report and accounts of other victims in this matter make clear, for literally decades OSU was deliberately indifferent to rampant sexual abuse of OSU students by Dr. Strauss. Specifically, as far back as 1979, during Dr. Strauss's first year of employment at OSU, numerous OSU officials knew Dr. Strauss was sexually assaulting male students and male student-athletes. If OSU had reasonably acted on this knowledge, the abuse could have been stopped shortly after it started and scores of victims, including JD, could have avoided the horrific sexual abuse they suffered at the hands of Dr. Strauss. But OSU turned a blind eye and did absolutely nothing, knowing OSU's students were at substantial risk of being sexually abused by a known sexual predator, and indeed one cloaked as a responsible physician and person of authority by OSU itself.

22. Instead, OSU allowed and enabled a sexual predator to remain employed at OSU for nearly twenty (20) years, and even required some of its student-athletes, like JD, to obtain medical exams and treatment from Dr. Strauss knowing that those student-athletes had a high likelihood of being sexually abused by Dr. Strauss.

23. Incredibly, for the entire length of Dr. Strauss's tenure at OSU, and even thereafter, OSU was deliberately indifferent to the safety of its students and student-athletes by (i) failing to meaningfully investigate the many complaints of Dr. Strauss's sexual abuse and harassment, (ii) failing to share reports of Dr. Strauss's sexual abuse and harassment, (iii) failing to report such conduct to the Ohio State Medical Board or to law enforcement, and (iv) failing to restrict or remove Dr. Strauss from his positions of authority over OSU students. If OSU had met these legal

---

[5] Perkins Coie Report, pg. 1.

obligations, the sexual assault, the sexual abuse, and the related suffering of OSU's students and student-athletes (including JD)—at the hands of Dr. Strauss—would have been prevented.

24.     Instead, OSU employed Dr. Strauss to provide medical care and treatment to OSU's students and student-athletes, appointing Dr. Strauss as an assistant professor of medicine, making him the team doctor for numerous varsity sports, and having him take on-call rotations at the Clinic, ensuring that his predation would expand beyond OSU's student-athletes.

25.     Dr. Strauss used this position of trust and confidence to repeatedly and consistently sexually assault OSU students and student-athletes under his care.  He would not have had this opportunity if it were not for this position given to him by OSU.

## JURISDICTION AND VENUE

26.     JD incorporates by reference the allegations contained in the previous paragraphs set forth above, as if fully set forth herein and below.

27.     This action is brought pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, as more fully set forth herein.

28.     This Court has subject matter jurisdiction pursuant to 28 U.S.C § 1331.

29.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because OSU resides in this District and the events giving rise to JD's claims arose in this District.

## PARTIES

30.     JD incorporates by reference the allegations contained in the previous paragraphs set forth above, as if fully set forth herein and below.

31.     JD is a resident of Ohio and attended college at OSU from 1985 to 1990, taking a leave of absence from OSU in the 1987-88 academic year to pursue a spot on the U.S. Olympic Boxing Team.

32.     Defendant OSU is a large, public university residing, *inter alia*, in Columbus, Ohio. OSU is, and at all relevant times has been, a State of Ohio owned and operated public university and institution of higher education organized and existing under laws of the State of Ohio. OSU receives federal financial assistance and is therefore subject to Title IX, 20 U.S.C. § 1681, *etseq*.

33.     At all times relevant hereto, OSU was complicit and deliberately indifferent to the sexual assault and sexually abusive conduct of Dr. Strauss. At all times relevant hereto, OSU was complicit and deliberately indifferent to reports it received regarding Dr. Strauss's sexually abusive conduct.

34.     At all times relevant hereto, non-party Dr. Strauss was an actual or apparent, duly authorized agent, servant, or employee of OSU and performed medical services for OSU student-patients and members of the OSU community as part of his employment at OSU.

35.     In or about 2005, Dr. Strauss committed suicide.

## SPECIFIC FACTUAL ALLEGATIONS[6]

**I.    JD and Dr. Strauss**

**a)    Background**

36.     JD was among the Nation's best football players in high school and became a world-class boxer while at OSU. JD won all-state football honors at Fremont Ross High School in Fremont, Ohio. As a senior at Fremont Ross, JD was named to the National High School Coaches Association All-American team, as one of the best linebackers in the United States.

37.     JD was recruited by dozens of the top college football programs in the United States, including Michigan State, Kansas, and—of course—OSU. Born and raised in Ohio, JD selected OSU to pursue his dreams of playing both college and professional football.

---

[6] JD incorporates by reference all allegations set forth above, as if fully set forth herein and below.

38.     While at OSU, JD was a leader both on and off the field.  In 1989, JD led OSU in tackles, which is a distinct achievement and honor at OSU.  Indeed, in the prior two seasons (1986 and 1987), that honor went to College Football Hall of Famer and NFL All-Pro linebacker, Chris Spielman.  In 1989, JD was named Captain of the OSU Football Team and, that same year, was recognized as the Team's Most Valuable Player.

39.     JD's biggest athletic accomplishments, however, came inside the boxing ring. Boxing since he was ten (10) years old, JD went on to win six (6) Golden Gloves state and national boxing titles.

40.     In 1984, JD was a National Golden Gloves semi-finalist, losing the semi-final round to Mike Tyson in a judges' decision on points.  In 1988, JD was the National Golden Gloves Heavyweight Champion, defeating—among others—Tommy Morrison (semi-finals) along the way.

41.     In the 1987-88 academic year, JD took a leave of absence from OSU to pursue a spot on the U.S. Olympic Boxing Team.  JD was invited to the 1988 Seoul, South Korea Olympics as USA Boxing's first-alternate in the heavyweight division, behind eventual 1988 Olympic Heavyweight Gold Medalist and future World Champion, Ray Mercer.  JD retuned to OSU for the 1988-89 academic year and graduated from OSU in 1990.

42.     JD began his professional boxing career in August 1990.  JD won his first twelve (12) professional bouts, before losing his first (and only) contest in May 1992.  JD ended his professional boxing career in August 1994, with an impressive record of fifteen (15) wins, including nine (9) knockouts, against only the one (1) loss.

43.     Despite these impressive athletic accolades and accomplishments, JD could have and would have had even greater success but for the sexual abuse he suffered at the hands of Dr.

Strauss.  As set forth more fully below, the sexual abuse inflicted by Dr. Strauss upon JD had a gradual and lasting psychological impact on every aspect of JD's life, and in particular his athletic career.

      **b)**      <u>**JD's Sexual Abuse by Dr. Strauss**</u>

44.      In or about August 1986, during JD's sophomore year at OSU, JD was instructed by the OSU Football staff to get his annual physical from Dr. Strauss.  Dr. Strauss was not the OSU Football Team's physician, but Dr. Strauss was apparently assigned by the OSU Athletic Department to assist in providing OSU Football Team physicals for the 1986 season.

45.      Specifically, JD was instructed to report to Billy Hill's office and to wait there until the doctor showed up to perform JD's physical.  A few minutes after JD arrived at Hill's office, Dr. Strauss entered the room.  JD and Dr. Strauss were alone in Hill's office.

46.      Immediately after entering Hill's office, Dr. Strauss ordered JD to drop his pants to the floor so that—according to Dr. Strauss—Dr. Strauss could perform a *hernia exam*.  JD complied.

47.      Instead of performing the type of hernia exam to which JD had become accustomed, Dr. Strauss began the *exam* by manipulating, massaging, and fondling JD's penis.  JD found this very strange and uncomfortable but remained silent while Dr. Strauss continued the exam.

48.      Dr. Strauss then used his second hand to hold and caress JD's testicles.  Once again, JD found this very strange and uncomfortable but remained silent while Dr. Strauss continued the exam.  This *exam* went on for several minutes.

49.      Given the extended length and unusual nature of the *exam*, JD became concerned that there may be a medical issue with his genitalia.  After several minutes, he asked Dr. Strauss, "anything wrong?"  Dr. Strauss responded, "no, you're OK."

50.     Notwithstanding Dr. Strauss's response, Dr. Strauss continued to manipulate, caress, and fondle JD's genitalia for several more minutes.

51.     As Dr. Strauss continued to *examine* JD, JD came to realize that Dr. Strauss was sexually abusing him.  In fact, the way in which Dr. Strauss was manipulating JD's genitalia, it seemed as if Dr. Strauss was trying to sexually arouse JD.  I was also clear that Dr. Strauss was enjoying the exam and may have even become aroused himself.

52.     JD, however, was too embarrassed and ashamed to confront Dr. Strauss.  JD was also concerned that—given this was an OSU mandated physical being administered by an OSU Athletics Department doctor—if JD had reacted physically or verbally toward Dr. Strauss, that JD would be risking his place on the OSU Football Team and potentially his athletic scholarship. Despite towering over Dr. Strauss at 6'2" and 200lbs., JD was frozen in place by Dr. Strauss's conduct—feeling helpless and entirely unsure of what to do—except to let Dr. Strauss finish the *exam* so that JD could get out of the room and away from Dr. Strauss as soon as possible.

53.     After the exam, knowing that Dr. Strauss had sexually abused him, JD was mortified, experiencing both extreme shame and embarrassment.

54.     JD approached Billy Hill, asking "Dr. Strauss, what is this guy doing?"  Hill responded by simply nodding his head and saying, "it's not up to me."  JD was not exactly sure what that meant, and not wanting to discuss the details of his abuse, JD left Hill's office and never spoke of the matter again with anyone at OSU.

c)     **The Gradual and Devastating Impact of Dr. Strauss's Abuse of JD**

55.     Up until the sexual assault by Dr. Strauss, JD was only a social drinker, and never drank during athletic seasons.  Immediately following the sexual abuse by Dr. Strauss, however,

JD began to binge drink large quantities of alcohol. JD did this in order to try to forget what Dr. Strauss had done to him.

56. While JD was actively playing, practicing, or in class at OSU, he was fine. But, after games, matches, practices, and schooling, all JD would think about was Dr. Strauss. Questions of "how could I have let him do this to me?"; "why did I not stop him?"; and "why did I not lay him out on the spot?" dominated JD's thoughts perpetually.

57. To stop these never-ending visions of Dr. Strauss's abuse, JD drank whenever he was not engaged in athletic competition or academics. When JD was in his late-teens and early-twenties, he could recover quickly from his binge drinking, and it did not have a large impact on his athletic endeavors.

58. This pattern went on for many years. JD would practice, have games, matches, classroom activities and schoolwork, and then when those events were over, he would go home and drink until he fell asleep. JD would get up the next day, and do the same thing. Not only did this constant binge drinking take a toll on JD's body, but it also put him into an almost perpetual depression.

59. As time went on and JD got older, he found it more and more difficult to recover both mentally and physically in order to bring himself to perform. By the time JD entered the world of professional boxing, in 1990, all JD did was train and drink. But, with each passing day, JD would have to train that much harder to account for the previous day's binge drinking and his ever-deepening submission into depression and alcoholism.

60. As noted above, JD had a stellar professional boxing career, winning fifteen (15) of his sixteen (16) professional boxing matches. After that fifteenth (15th) win in August 1994, however, JD simply could not continue. He was both mentally and physically unable to rise each

morning and perform as a world-class boxer, while at the same time an uncontrollable bingeing alcoholic. The daily toll was simply too great.

61.     Shortly after that last bout, JD ceased all boxing activities and sought help for his alcoholism. Ultimately, JD got sober, but never returned to the ring.

62.     JD retired from professional boxing with one of the best winning percentages in the history of the sport. Had it not been for Dr. Strauss's sexual abuse, there is little doubt that JD would have achieved far greater success in the world of professional athletics.

63.     To this day, every time JD goes for a physical, the thoughts of what Dr, Strauss did to him runs through his mind. During these exams, even over thirty (30) years later, JD often becomes overwhelmed with emotions and paralyzed by the fear that he will have to relive the sexual abuse he experienced with Dr. Strauss.

**d)     JD Learns That Others at OSU Were Sexually Abused**

64.     In or about April 2018, when the Perkins Coie investigation was announced, JD learned for the first time that other OSU students and student-athletes had been sexually abused by Dr. Strauss. Although JD was outraged that OSU had clearly known about the pervasive sexual abuse of OSU students and student-athletes by Dr. Strauss for many years—and could have even prevented JD's abuse at the hands of Dr. Strauss—JD was reluctant to get involved for fear that he would have to detail and relive one of the most traumatic experiences of his entire life.

65.     In or about late-2018, JD learned that a class action had been filed against OSU, relating to the sexual abuse perpetuated on OSU students and student-athletes by Dr. Strauss, and that JD was a potential member of that class. JD was comforted by this, knowing that stories similar to his would eventually come to light and that redress was being sought against the school that had betrayed JD's trust.

66.     Recently, however, JD made the decision that he was ready to tell his story and, thus, decided to file his own separate action as set forth herein.

II.     **OSU Knowingly Employed a Serial Sexual Predator**

67.     In September 1978, Dr. Strauss was hired by OSU as an Assistant Professor in the College of Medicine.   Within months after beginning his employment, Dr. Strauss began volunteering in the OSU Athletics Department.  By 1980, Dr. Strauss was serving as an Associate Director of the Sports Medicine program, and in 1981, Dr. Strauss began an appointment in the Athletics Department.   The Athletics Department appointment included responsibilities at the Sports Medicine Clinic located in OSU's Student Health Services, *i.e.*, the Clinic.[7]

68.     Beginning in 1978, Dr. Strauss's first year at OSU, and continuing throughout his twenty (20) years at OSU, students and OSU staff reported and referred complaints about Dr. Strauss to numerous OSU employees and administrators.   As concluded in the Perkins Coie Report, as early as 1979, OSU employees in OSU's Sports Medicine program and Athletics Department were aware that Strauss was conducting genital examinations on male student-athletes that were unusually prolonged, and that Strauss refused to allow athletic training staff to be present for these protracted genital examinations.[8]

69.     Indeed, for the entire length of Dr. Strauss's employment at OSU, not less than fifty employees in the OSU Athletics Department were aware of student-athlete complaints about Dr. Strauss—at the time they were made—and corroborated them.[9]  As concluded in the Governor's Medical Board Report:  "Although many were aware of complaints or rumors about the abuse, no

---

[7] Perkins Coie Report, pg. 2.
[8] *Id.*
[9] *Id.* at pg. 88.

one advanced concerns raised by students or unraveled Strauss's 'medical' defenses of his abuse."[10]

70.     The Perkins Coie Report specifically concluded that *at least* 177 male students were sexually abused by Dr. Strauss, although the actual number is likely in the thousands, as admitted by OSU.[11]   Indeed, the Perkins Coie Report only accounted for former OSU students that were alive, identified and contacted by Perkins Coie, and willing to speak with Perkins Coie about their experiences with Dr. Strauss.

71.     From 1978 to 1996, Strauss was an OSU team doctor and had regular contact with male student-athletes in many sports including, but not limited to, baseball, football, ice hockey, tennis, swimming, fencing, wrestling, lacrosse, and soccer.  Dr. Strauss also took rotations as the on-call physician at the Clinic, and conducted physicals on other student-athletes, such as JD, that were not necessarily on a team for which Dr. Strauss was responsible.

72.     As further concluded in the Perkins Coie Report, complaints of sexual abuse by Dr. Strauss date back as early as 1979, with approximately half the reports occurring from 1979 to 1988, covering the years in which JD was sexually abused and assaulted as a student-athlete at OSU.[12]

73.     The sexual abuse victims interviewed for the Report outlined Dr. Strauss's years of persistent sexual abuse and detailed the stark similarities in these many stories, described as "both highly credible and cross-corroborative."[13]

---

[10]  Governor's Medical Board Report, pg. 1.
[11]  Perkins Coie Report, pg. 1; https://news.osu.edu/university-issues-annual-crime-report (last visited on July 20, 2021).
[12]  *Id.* at pg. 39.
[13]  *Id.* at pg. 13.

74. Of the 177 Dr. Strauss abuse victims interviewed by Perkins Coie, 153 were associated with Dr. Strauss—at least in part—through his role in the OSU Athletics Department, as was JD.

## II. OSU Knowingly Employed a Serial Sexual Predator

75. On May 17, 2019, the Perkins Coie Report was released. The Report clearly establishes OSU's repeated failures to escalate or report complaints of sexual abuse by Dr. Strauss. The Report also shows OSU repeatedly failed to act despite knowledge reaching OSU's administration, particularly in both the OSU Athletics Department and Sports Medicine Department.[14]

76. Specifically, Dr. Strauss's sexual abuse of OSU students was widely discussed within the administration of OSU's Athletics Department, including his proclivity to conduct inappropriately lengthy and unnecessary genital exams.[15]

77. As concluded in the Perkins Coie Report, these behaviors would continue for almost two more decades. The Report also explicitly confirmed that the genital exams engaged in by Dr. Strauss served no medical purpose whatsoever, and only served to satisfy Dr. Strauss sexual predilections and for Dr. Strauss's horrid personal sexual gratification.[16]

78. As complaints of sexual assaults by Dr. Strauss continued to skyrocket over the years, OSU continued to take no action whatsoever, as confirmed by the Perkins Coie Report: "Despite the persistence, seriousness, and regularity of such complaints, no meaningful action was taken by [OSU] to investigate or address the concerns until January 1996.[17] Moreover, OSU could have, but did not (i) at the very least, impose conditions on Dr. Strauss's employment, such as a

---

[14] *Id.* at pg. 2.
[15] *Id.* at pg. 88.
[16] *Id.* at pg. 48.
[17] *Id.* at pg. 3.

chaperoning policy, (ii) terminate Dr. Strauss for his known sexual assaults of OSU students, and, (iii) pass on the credible reports of Dr. Strauss's regular and persistent abuse of OSU students to the Ohio Medical Board, nor to Federal, State, or local law enforcement.  Indeed, OSU did not even meaningfully investigate Dr. Strauss until eighteen (18) years after he began abusing OSU students and student-athletes, despite the fact that reports of Dr. Strauss's abuse began pouring in almost immediately after his employment at OSU began in 1978.

79.     Among the most troubling facts included in the Perkins Coie Report, and in other complaints filed in the related OSU actions, was the number of OSU employees that had specific knowledge of OSU student complaints against Dr. Strauss, and yet consciously decided to do absolutely nothing.

80.     The following are some examples of reported incidents of sexual abuse by Dr. Strauss on OSU student-athletes identified in the Perkins Coie Report, or otherwise publicly available, and the OSU personnel that knew about them while JD was a student at OSU:

      i)     In 1978, Dr. Strauss fondled a wrestling team member, David Mulvin, during a physical exam for a routine wrestling infection—with Dr. Strauss attempting to sexually arouse David during the exam.  David went immediately to the student health center where he complained about Dr. Strauss's fondling to another doctor.  The doctor confirmed for David that the exam he described was "not normal."  The doctor then explained that he would make a note about Dr. Strauss's behavior and pass it along to other appropriate administrators.  David believed that the doctor he reported to was Dr. Strauss's boss at the time and would take action.[18]  This doctor then examined David, without touching him, and gave him an antibiotic.  To the extent the health center doctor or OSU actually did

---

[18] https://sanduskyregister.com/news/91853/perkins-wrestling-champion-among-first-accusers-of-osu-doctor (last visited on July 20, 2021).

anything to address this report, it was entirely ineffective, because Dr. Strauss kept moving up the ranks at OSU and would go on to sexually assault thousands of more students and student-athletes.

ii)    Also, in 1978, an OSU wrestler visited Dr. Strauss for a groin injury.[19]  The wrestler's injury had caused a blister and bruise on the wrestler's penis, but Dr. Strauss told him it was from masturbating.[20]  Dr. Strauss then told the wrestler that Dr. Strauss needed to *milk* his penis.  Dr. Strauss began masturbating the wrestler's penis until the wrestler ejaculated.[21]  Shortly after the exam, the wrestler told his Head Coach Chris Ford exactly what happened.  Head Coach Ford told the wrestler that he would look into it, but the Coach did not appear to believe him.[22]  It does not appear that Head Coach Ford, or anyone else at OSU, did anything to investigate this report.

iii)    By 1979, OSU personnel in the Athletics Department and Sports Medicine program were aware that Dr. Strauss was conducting genital examinations on male student-athletes that were unusually prolonged, and that Strauss refused to allow athletic training staff to be present for these protracted genital examinations.[23]  It does not appear that OSU administrators did anything regarding these reports.

iv)    From 1980, through 1984, Melvin Robinson (an OSU track and field athlete) was treated by Dr. Strauss two (2) to three (3) times per year for mandatory physicals and various injuries.[24]  During each exam, Dr. Strauss told Melvin to drop his

---

[19]  (Proposed Corrected) Second Amended Complaint, *Snyder-Hill, et al. v. The Ohio State University* (S.D.Oh. 2:18-cv-00736-MHW-EPD) (Dkt. No. 103-2) ("Snyder-Hill SAC"), pg. 172-73.
[20]  *Id.* at pg. 173.
[21]  *Id.*
[22]  *Id.*
[23]  Perkins Coie Report, pg. 2.
[24]  Snyder-Hill SAC, pg. 71.

pants and Dr. Strauss would proceed to touch Melvin's genitals.[25] Dr. Strauss's exams made Melvin extremely uncomfortable and Melvin thought they may be inappropriate. After Melvin's first two visits to Dr. Strauss, Melvin told Head Coach Frank Zubovich he did not want to see Dr. Strauss anymore.[26] After each additional exam by Dr. Strauss, Melvin continued to tell Head Coach Zubovich he did not want to be examined by Dr. Strauss anymore, but Head Coach Zubovich completely ignored his multiple requests.[27] In addition, Head Coach Zubovich, nor OSU, did anything to investigate Melvin's complaints.

v)    In 1981, Dr. Strauss himself recognized that "rumors" about his sexual misconduct were circulating at OSU.[28] It does not appear that OSU did anything to investigate the rumors that Dr. Strauss himself knew about.

vi)    In 1983, a member of the OSU Men's Tennis Team received a physical from Dr. Strauss.[29] During his physical, Dr. Strauss held the player's penis and said that it was a good size.[30] Dr. Strauss held the player's foreskin and commented about the player being uncircumcised. Dr. Strauss then seemingly asked about the player's sexual performance with an uncircumcised penis. Dr. Strauss continued to hold the player's penis and foreskin for a prolonged period of time, and the player became increasingly uncomfortable. Dr. Strauss eventually released the player's penis.[31]

vii)    The player's physicals with Dr. Strauss were unlike any physical he had undergone previously or since then. Each year at OSU, the player tried to avoid getting his

---

[25] Id.
[26] Id.
[27] Id.
[28] Perkins Coie Report, pg. 95.
[29] Snyder-Hill SAC, pp. 87-88.
[30] Id. at pg. 88.
[31] Id.

annual physical from Dr. Strauss because he felt uncomfortable about the way Dr. Strauss touched his genitals.[32]  But, each year Head Coach John Daly informed the player that he had to get his physicals from Dr. Strauss or he would not be eligible to play tennis at OSU.[33] Head Coach Daly even went so far as to joke that sending tennis players to Dr. Strauss was a form of punishment.[34]

       viii)    Also, in 1983, an OSU Head Coach received a report regarding Dr. Strauss when a student sought treatment for a foot injury and was forced to drop his pants.[35]  It does not appear that this Head Coach or OSU did anything to investigate this report or otherwise confront Dr. Strauss about it.

       ix)    In 1984, this same Head Coach received reports from numerous student-athletes that Dr. Strauss was observing them take showers.[36]  Once again, it does not appear that this Head Coach or OSU did anything to investigate this report or otherwise confront Dr. Strauss about it.

       x)    Also, in 1984, Kurt Huntsinger (an OSU Swimmer) was directed to Dr. Strauss for his mandatory physical.[37]  Once in the exam room, Dr. Strauss instructed Kurt to drop his trousers.  Dr. Strauss then sat at eye level with Kurt's genitals and began to closely examine Kurt's penis and testicles, moving his penis up and down and side to side.[38] Kurt was uncomfortable with the examination and even commented to Dr. Strauss about it.  After this first physical, and on several occasions after that, Kurt told Head Coach Dick Sloan that he was uncomfortable with Dr. Strauss's examination.  Head Coach Sloan,

---

[32] *Id.*
[33] *Id.*, at 89.
[34] *Id.*  At least one other tennis player reported similar conduct by Head Coach Daly (*id.* at 96).
[35] Perkins Coie Report, pg. 96.
[36] *Id.*
[37] Snyder-Hill SAC, pg. 64.
[38] *Id.*

however, made light of the complaint, laughed about other athlete's descriptions of their own examinations, and said that is just what Dr. Strauss does.[39]

      xi)    In 1986, Dr. Robert Murphy, OSU's Head Team Physician, advised Dr. Strauss that rumors of Dr. Strauss's sexual abuse during physical exams were prevalent throughout the fencing team.  Dr. Strauss and Dr. Murphy agreed that Dr. Strauss would avoid treating fencers.[40]  Unbelievably, neither Dr. Murphy nor OSU did anything to protect non-fencers.  It is entirely illogical to believe that Dr. Strauss's sexual abuse was limited to fencers, even if fencers were the only ones to report the abuse—which of course is not true.  Instead of investigating the reports, OSU and Dr. Murphy did nothing and allowed the potential continued abuse of all OSU male students and non-fencer male student-athletes.

      xii)    Also, in 1986, Kelly Reed (an OSU track and field athlete) visited Dr. Strauss after tearing a hamstring.[41]  During the exam, while Kelly's genitals were right "in front" of Dr. Strauss, Dr. Strauss "grabbed [Kelly's] genitals.  And while he did that, he had the gown up.  He was telling me how great my legs are.  He said 'Oh my God.  You have a really nice body.'"[42]  Dr. Strauss then took Kelly's penis in one hand and began rubbing his testicles with the other hand.[43]  Kelly ended the exam early, put on his clothes, and left.[44]  Kelly tried to meet with Athletic Director, Rick Bay, but "was ignored."[45]  Kelly

---

[39] *Id.*
[40] Perkins Coie Report, pg. 95.
[41] https://www.wkyc.com/article/news/local/ohio/new-federal-lawsuit-filed-against-ohio-state-university-over-alleged-sexual-abuse/95-582514930 (last visited on July 20, 2021).
[42] *Id.*
[43] Snyder-Hill SAC, pg. 54.
[44] *Id.*
[45] https://www.wkyc.com/article/news/local/ohio/new-federal-lawsuit-filed-against-ohio-state-university-over-alleged-sexual-abuse/95-582514930 (last visited on July 20, 2021).

also told OSU Trainer Rob Morris, but Mr. Morris did not seem to take the allegations seriously.[46]

  xiii) Kelly also told Head Coach Frank Zubovich and Assistant Coach Roger Bowen about Dr. Strauss massaging his genitals, but Head Coach Zubovich did not take it seriously and Assistant Coach Bowen simply laughed at Kelly.[47] Kelly followed up with Head Coach Zubovich to see if the Coach had reported Dr. Strauss, but Head Coach Zubovich ignored him and nothing changed with Dr. Strauss at OSU.[48] It does not appear that Head Coach Zubovich or anyone else at OSU, ever meaningfully investigated the matter.

  xiv) In 1986 or 1987, an OSU swim team member had a physical performed by Dr. Strauss.[49] While at eye level with the swimmer's genitals, Dr. Strauss began manhandling the swimmer's penis and scrotum, grabbing the swimmer's penis and moving it in all different directions.[50] When the swimmer tried to tell Head Coach Dick Sloan that the swimmer was uncomfortable with Dr. Strauss, Head Coach Sloan cursed at him and ordered into the swimming pool.[51] In addition, Head Coach Sloan rebuffed or entirely ignored any negative comments other Swim Team members made about their exams from Dr. Strauss while the swimmer was at OSU from 1986 to 1990.

  xv) In the late-1980s, Roger Beedon (an OSU ice hockey player) went to Dr. Strauss for a physical examination. During the examination, Dr. Strauss sat on a stool directly in front of Roger, with Dr. Strauss's head at about the height of Roger's penis.[52]

---

[46] Snyder-Hill SAC, pg. 54.
[47] *Id.*
[48] *Id.* at pg. 55.
[49] *Id.* at pg. 146.
[50] *Id.* at pg. 146-47.
[51] *Id.* at pg. 147.
[52] (Proposed) Second Amended Class Action Complaint, *Garrett, et al. v. The Ohio State University* (S.D.Oh. 2:18-

Dr. Strauss required Roger to completely remove his shorts and underwear. After completing a hernia exam, Dr. Strauss took Roger's penis and lifted it up towards his belly button, inspecting his scrotum. During this time, he placed his hands on Roger's testicles several times. In Roger's opinion, Dr. Strauss was trying to stimulate him sexually.[53]

xvi)    Dr. Strauss also isolated Roger at the OSU ice rink and photographed Roger with his shirt off. Roger, along with a teammate, reported Dr. Strauss's conduct to then-assistant athletic trainer (later Director of Athletic Training) Bill Davis, who expressed concern, but apparently did nothing.[54]

xvii)    In 1988, Student R and a teammate were questioned by Mr. Davis about Strauss's exams in detail. Student R remembered Mr. Davis being concerned and thought Strauss would be fired or removed, but nothing ever happened.[55]

xviii)    Also in 1988, an Assistant Coach corroborated that Student R reported to the Assistant Coach about Dr. Strauss and that Mr. Davis was involved in evaluating Student R's report.[56] The Assistant Coach then met with Mr. Davis, as well as the team's head coach to discuss Student R's report.[57] Mr. Davis and the head coach "decided then and there" that Dr. Strauss would never see an athlete without a trainer present.[58] Obviously, this decision was not implemented and at least hundreds, if not thousands, more OSU student-athletes would continue to be sexually abused by Dr. Strauss.

xix)    In 1989, another OSU team physician recalled that he witnessed a student emerge from an exam and announce to the training room that Dr. Strauss had

---

cv-00692-MHW-EPD) (Dkt. No. 126) ("Garrett SAC"), pg. 22.
[53] Garrett SAC, pp. 22-23.
[54] Garrett SAC, pg. 23.
[55] Perkins Coie Report, pg. 104.
[56] *Id.* at pg. 105.
[57] *Id.*
[58] *Id.*

inappropriately examined his genitals.[59] The team physician recalled speaking to the athletic trainer and that the trainer reported this information to Dr. Murphy (OSU Head Team physician) to be investigated.[60] Although the team physician recalls being told by the trainer that the issue had been investigated, there is no evidence that OSU or Dr. Murphy ever investigated or followed up on the incident in any meaningful way.[61]

xx)    In the late 1980s, a nurse reported to Dr. Doris Charles (OSU's Student Health Director) that Dr. Strauss's examinations of male students took much "longer than normal."[62] Dr. Charles dismissed these concerns and did nothing.[63]

xxi)    In the late 1980s to early 1990s, Assistant Athletic Director Larry Romanoff repeatedly reported to Dr. Murphy that Dr. Strauss was showering with student-athletes.[64] It does not appear, however, that Dr. Murphy ever followed up on the reports or showed any concern at all.[65]

81.    The Perkins Coie Report goes through the OSU departments where Dr. Strauss was employed: Student Health, the Athletics Department, the Clinic, etc., and who, in each department, had knowledge of Dr. Strauss's reported sexual abuse.

82.    And, if any one of these dozens of OSU agents, employees, or administrators with knowledge had taken action, investigated further, escalated the reports to OSU executives or reported to law enforcement, Dr. Strauss's reign would have been stopped. But these people, individually and collectively, did absolutely nothing to protect OSU students.

---

[59] *Id.* at pg. 101.
[60] *Id.*
[61] *Id.*
[62] *Id.* at pg. 121.
[63] *Id.*
[64] *Id.* at pg. 100.
[65] *Id.*

83. Moreover, the Perkins Coie Report is shocking in its account of just how many OSU personnel admitted that they knew of Dr. Strauss's sexual misconduct when Dr. Strauss was employed at OSU.

84. It bears noting that the following numbers do not account for other OSU employees that were no longer alive in 2018-19, or that otherwise simply chose not to be interviewed by Perkins Coie:

    i)    At least two (2) OSU Athletic Directors received reports about Dr. Strauss's sexual misconduct.

    ii)    At least two (2) OSU Head Team Physicians received reports about Dr. Strauss's sexual misconduct.

    iii)    At least six (6) OSU Assistant Athletic Directors received reports about Dr. Strauss's sexual misconduct.

    iv)    At least five (5) OSU Team Physicians received reports about Dr. Strauss's sexual misconduct.

    v)    At least twenty-two (22) OSU Coaches received reports about Dr. Strauss's sexual misconduct.

    vi)    At least one (1) OSU Athletic Training Director received reports about Dr. Strauss's sexual misconduct.

    vii)    At least four (4) OSU Athletic Trainers received reports about Dr. Strauss's sexual misconduct.

85. An unknown number of other OSU personnel, executives, lawyers, trustees, and other OSU agents were aware of complaints against Strauss, or at a minimum, had heard rumors about his disturbing conduct while treating male students and male student-athletes.

86.     Any one of the OSU individuals referenced in the preceding paragraphs herein, each an agent of OSU, was an "appropriate person" under the law.  And, each of these referenced individuals was in a position to protect students.

87.     But, for two decades, while thousands of unsuspecting students were subjected to rape, sodomy, and other pervasive sexual molestation, OSU took no action to investigate, to intervene, to share, to escalate, to publicize, to remove, to discipline, to report, or to otherwise protect OSU students and Student Athletes from Dr. Strauss.[66]

### III.     Dr. Strauss is Finally Investigated, But OSU Continues to Cover His Tracks and Enable Dr. Strauss's Sexual Abuse of OSU Students

88.     The Perkins Coie Report set forth that, in January 1995, "Coach A" acknowledged that he personally confronted Dr. Strauss about Dr. Strauss's propensity for showering with student-athletes.   "Coach A" never elevated this concern because he thought he adequately addressed the issues with Dr. Strauss.[67]

89.     Also, in January 1995, two student-patients (Students A and B) from the Clinic each reported complaints of sexually inappropriate conduct by Dr. Strauss to OSU Student Health administrators.[68]

90.     In January 1996, after Student C reported being molested by Strauss to Dr. Ted Grace, Dr. Strauss was finally—after eighteen (18) years of abusing and molesting OSU students and student-athletes under his care—placed on administrative leave from Student Health and the

---

[66] OSU's pattern of ignoring its students' civil rights is nothing new, and likely is continuing at OSU today.  *See* Letter from Meena Morey Chandra, Regional Director, Reg. XV, Office for Civil Rights, U.S. Dep't Educ., to Dr. Michael V. Drake, President, Ohio State University 2 (Sept. 11, 2014), https://www2.ed.gov/documents/press-releases/ohio-state-letter.pdf (last visited on July 20, 2021); *see also see also* Resolution Agreement, Ohio State University, OCR Docket #15-10- 6002, available at https://www2.ed.gov/documents/press-releases/ohio-state-agreement.pdf (last visited on July 20, 2021); *and* Jennifer Smola, *Ohio State closes sexual-assault center, fires 4 after complaints*, The Columbus Dispatch (June 20, 2018), http://www.dispatch.com/news/20180619/ohio-state-closes- sexual-assault-center-fires-4-after-complaints (last visited on July 20, 2021).
[67] Perkins Coie Report, pg. 91.
[68] *Id*. at pg. 114.

Athletics Department.[69]  In June 1996, OSU's Student Affairs held a disciplinary hearing into these three recent complaints and a 1994 complaint handled by John Lombardo (OSU Head Team Physician)—no other complaints were investigated at this time.[70]

91.    Despite these complaints, and Dr. Strauss's well-known history and scope of sexual abuse at OSU, Dr. Strauss was only terminated from OSU's Athletics Department, "remain[ing] employed at [OSU] as a tenured professor in the School of Public Health."[71]

92.    OSU did remove Dr. Strauss from his position in the OSU Athletics Department, but OSU did not report these findings of abuse to the Ohio Medical Board or to law enforcement, which allowed Dr. Strauss to continue seeing patients.  Indeed, as concluded in the Governor's Medical Board Report: "[N]one of the physicians working with [Dr.] Strauss found occasion to report him to the Medical Board or to law enforcement – even after [OSU] suspended him from seeing patients . . . [nor] did [OSU] or any of its administrators involve campus or outside law enforcement, even after recognizing that the severity and pervasiveness of [Dr.] Strauss' abuse compelled the withdrawal of authority to see patients and the nonrenewal of his contract."[72]

93.    OSU further allowed Dr. Strauss to open an off-campus men's clinic in 1996, advertise in OSU's student newspaper in both 1996 and 1997, and permitted him to offer a student discount, enabling Dr. Strauss's continued abuse of OSU students.[73]

94.    Among its multiple failures, OSU's Student Affairs investigation in 1996 never sought to identify Dr. Strauss's many victims.  Moreover, as set forth in the Perkins Coie Report, OSU failed to take "additional steps to identify other students who had previously complained

---

[69] *Id*. at pg. 114-15.
[70] *Id.* at pg. 147.
[71] *Id.* at pg. 145-46.
[72] Governor's Medical Board Report, pg. 3.
[73] Perkins Coie Report, pg. 5.

about [Dr.] Strauss," even as OSU falsely asserted to the Ohio Medical Board that it was working to do so.[74] If OSU had made even the slightest efforts to identify and inform victims of Dr. Strauss's abuse and molestation, OSU would have been able to start the healing process for these victims twenty-four (24) years ago. But, consistent with its history of indifference to its own students' suffering, OSU did nothing.

95.     In October 1997, Dr. Strauss announced that he was retiring from OSU, likely because he now had more limited access to students, and particularly student-athletes. Quite unbelievably, however, when Dr. Strauss's retirement became effective in March 2018, OSU's "Board of Trustees approved [Dr.] Strauss's appointment as Faculty Emeritus in [OSU's] School of Public Health."[75]

## IV.    JD Did Not Know and Could Not Have Reasonably Discovered That Both Dr. Strauss's Sexual Abuse Was Widespread and that OSU Knew About It and Did Nothing

96.     When the investigation into Dr. Strauss was publicly announced, and the Perkins Coie Report was subsequently released, JD—for the first time—realized that he had not only been victimized by Dr. Strauss, but that OSU itself, the institution he had trusted and beloved, had betrayed him.

97.     Indeed, according to the recent testimony of several senior OSU administrative physicians that work with—and had supervisory responsibilities over—Dr. Strauss, OSU student-victims could not have known about OSU's awareness (as early as 1978) and willful disregard of Dr. Strauss's pervasive sexual abuse of OSU students and student athletes, until the release of the Perkins Coie Report. Specifically, Dr. Ted Grace (former Director of OSU Student Health Services) testified:

---

[74] *Id.* at pg. 4.
[75] *Id.* at pg. 154.

> Q: Is there any way any Ohio State student could have known that their university failed on the job for 20 years to get rid of [Dr. Strauss]?
>
> OSU COUNSEL: Object to the form of the question.
>
> A: I don't know of any way.

Dr. Ted Grace Tr., at pg. 307.

98.     Dr. Roger Miller, former Chief of Preventative Medicine of OSU Student Health and former Lead Physician of OSU Student Health, testified:

> Q: Reading [the] Perkins Coie [Report] you came to learn that Dr. Strauss started abusing patients in the late 1970s; correct?
>
> A: Yes.
>
> Q: That's not information you knew before; right?
>
> A: That's correct.
>
> . . .
>
> Q: And is there any way OSU -- any OSU student could have known that Dr. Strauss was a sexual predator against students for over 20 -- for approximately 20 years before OSU got rid of him?
>
> A: I don't believe they would have known.

Dr. Roger Miller Tr., at pg. 314.

99.     Up until the release of the Perkins Coie Report, JD believed that the instances of sexual abuse he had experienced at the hands of Dr. Strauss were isolated and that OSU (as an institution) was unaware of Dr. Strauss's conduct.  Moreover, it was not until the Perkins Coie Report was released that JD appreciated the magnitude of the abuse of OSU students and student-athletes or OSU's role in permitting Dr. Strauss's rampant sexual misconduct.

100.     And, it was not until the release of the Perkins Coie Report that JD realized OSU had knowledge of Dr. Strauss's sexual abuse since shortly after Dr. Strauss was hired—and before JD became an OSU student—but chose to ignore it.  Or, that OSU personnel including, but not limited to, athletic directors, coaches, trainers, administrators, physicians, and executives all knew about reports made by students against Dr. Strauss and did nothing.[76]

## CLAIMS FOR RELIEF

### COUNT I
**Violation of Title IX, 20 U.S.C. § 1681, *et seq.***
**OSU's Sexually Hostile Culture and Heightened Risk of Sexual Harassment**

101.     JD incorporates by reference the allegations set forth above as if fully set forth herein and below.

102.     Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance "

103.     Title IX is implemented through the Code of Federal Regulations. *See* 34 C.F.R. Part 106. 34 C.F.R. § 106.8(b) provides: ". . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."

104.     Sexual harassment of students is a form of sex discrimination covered by Title IX. Sexual harassment is unwelcome conduct of a sexual nature, including unwelcome sexual

---

[76]  JD's lack of knowledge is further supported by the testimony of several physicians that were Dr. Strauss's supervisors at the relevant time.  These physicians each assert that they had no knowledge of the rumors, reports, or complaints against Dr. Strauss until the public release of such information in 2018 or 2019 (Dr. Forrest Smith Tr., pg. 100; Dr. John Lombardo Tr., pp. 56, 169, and 235).

advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.

105.    Title IX covers all persons subjected to discrimination in any program or activity of a school that receives any federal financial assistance and covers sexual harassment— including sexual assault and sexual abuse—by school employees, students, and third parties.  Title IX requires OSU to promptly investigate all allegations of sexual harassment, including sexual assault and abuse.

106.    Dr. Strauss's pervasive sexual harassment of JD and others, as described herein and in other complaints filed in the related actions, is sex discrimination under Title IX—taking place over nearly two decades.

107.    OSU had actual knowledge of Dr. Strauss's serial sexual harassment and permitted it to continue unchecked until at least 1996.

108.    OSU was specifically notified of Dr. Strauss's sexual harassment and abuse of OSU students by and through OSU employees with authority to take corrective.  As identified above, these specific OSU employees include, but are not limited to:  Head Team Physician and Director of Sports Medicine Dr. Bob Murphy; Assistant Athletic Director Larry Romanoff; Head Tennis Coach John Daly; Head Track and Field Coach Frank Zubovich; Head Swimming Coach Dick Sloan; Head Wrestling Coach Chris Ford; Athletic Director Rick Bay; Athletics Trainer Rob Morris; Assistant Track and Field Coach Roger Brown; Director of Athletics Training Bill Davis; and Student Health Director Dr. Doris Charles.

109.    As identified in additional publicly available materials, other specific OSU employees with authority to take corrective action include, but are not limited to: Director of Student Health Services, Dr. Ted Grace; Athletic Director and Assistant OSU Vice President Andy

Geiger; Athletic Director Jim Jones; Assistant Athletic Director Archie Griffin; Athletic Director Hugh Hindman; Senior Associate Athletic Director Paul Krebs; Head Fencing Coach Charlotte Remenyik; Associate Sports Information Director Steve Snapp; Assistant Athletic Director Richard Delaney; Assistant Director of Student Athlete Support Services John Macko; Head Athletic Trainer Billy Hill; Head Wrestling Coach Russ Hellickson; and Head Gymnastics Coach Peter Kormann.

110. OSU was required to, but did not, promptly investigate and address the pervasive allegations, reports, and complaints of misconduct by Dr. Strauss.

111. OSU created and was deliberately indifferent to a sexually hostile culture within its education programs and activities, by, among other things: (i) failing to promptly investigate and respond to complaints about Dr. Strauss's conduct; (ii) promoting Dr. Strauss within OSU thereby enabling his ever increasing access to sexually abuse OSU students; (iii) failing to appropriately supervise Dr. Strauss after reports of his sexual abuse of students began pouring in; (iv) intentionally and deliberately requiring student-athletes to get their annual physicals and other medical care from Dr. Strauss despite these student-athletes discomfort with Dr. Strauss and the coaches' and administrators knowledge of Dr. Strauss's inappropriate sexual conduct towards students; (v) cavalierly dismissing and joking about complaints regarding Dr. Strauss from students and student-athletes; (vi) threatening student-athletes with dismissal from teams if they refused to be treated by Dr. Strauss; (vii) concealing the scope of abuse by Dr. Strauss even after an OSU investigation found Dr. Strauss to be a sexual predator; and, (viii) enabling Dr. Strauss to continue his abuse of OSU students by allowing him to open a nearby men's clinic and advertise it in the OSU student newspaper.

112.     The sexual abuse that JD suffered was so severe that it effectively barred his access to continued educational opportunities, including a safe educational environment and appropriate medical care.  As a direct and proximate result of OSU's creation of and deliberate indifference to a sexually hostile educational environment on OSU's Campus, which violated Title IX, JD suffered, and continues to suffer, damages and injuries.

<u>**COUNT II**</u>
**Violation of Title IX, 20 U.S.C. § 1681, *et seq.***
**OSU's Deliberate Indifference to Reported Sexual Harassment**

113.     JD incorporates by reference the allegations set forth above as if fully set forth herein.

114.     Years before Dr. Strauss sexually assaulted JD, OSU had actual knowledge of Dr. Strauss's prior sexual harassment and abuse of male students and student-athletes at OSU. Moreover, between 1978 and 1996, numerous students and student-athletes complained to OSU administrators and staff about Dr. Strauss's inappropriate conduct.

115.     Based upon this reported sexual misconduct by Dr. Strauss, OSU had actual knowledge of the substantial risk, and in fact the likelihood, that Dr. Strauss would sexually harass other OSU students and student-athletes, like JD.

116.     OSU agents, employees, administrators, and officials, armed with this knowledge, had the authority to address the risk posed by Dr. Strauss, and had the authority to take corrective measures—but until no earlier than 1996, failed to act.  OSU's failure to address the substantial risk to OSU students posed by Dr. Strauss, was manifestly unreasonable in light of the known circumstances surrounding Dr. Strauss.  As such, OSU was deliberately indifferent to the substantial risk that Dr. Strauss would sexually harass other OSU students and student-athletes, like JD.

117. As a result of OSU's deliberate indifference, JD was subjected to the severest of sexual abuse by Dr. Strauss, depriving him of access to educational opportunities and benefits, including a safe educational environment and appropriate medical care.

118. As a direct and proximate result of OSU's deliberate indifference to Dr. Strauss's prior sexual harassment of OSU students and student-athletes, which violated Title IX, JD has suffered and continues to suffer damages and injuries.

## PRAYER FOR RELIEF

Wherefore, JD respectfully requests that this Court:

A. Enter judgment against OSU, and in favor of JD, in such amounts that will completely and adequately compensate JD for all the damages he has suffered including, but not limited to, payment of JD's medical and other expenses incurred as a consequence of the sexual assault of JD and OSU's deliberate indifference thereto; damages for JD's pain and suffering as a result of Dr. Strauss's sexual assault of JD and OSU's deliberate indifference thereto; damages for deprivation of equal access to the educational opportunities and benefits provided by OSU; damages for past, present and future emotional pain and suffering as a result of Dr. Strauss's sexual assault of JD and OSU's deliberate indifference thereto; and, loss of past and future earnings and earning capacity attributable to Dr. Strauss's sexual assault of JD and OSU's deliberate indifference thereto, in an amount to be determined at trial;

B. Award JD punitive damages against OSU in an amount to be determined by a jury for OSU's violations of federal law;

C. Award JD pre-judgment and post-judgment interest;

D. Award JD his actual expenses of litigation, including reasonable attorney's fees pursuant to 42 U.S.C. § 1988(b); and

E.      Award JD such other and further relief as the Court deems just and proper.

Dated: Columbus, Ohio
       August 25, 2021

                                  Respectfully Submitted,

                                  */s/ John C. Camillus* ___

John C. Camillus, Trial Attorney (0077435)
Law Offices of John C. Camillus, LLC
P.O. Box 141410
Columbus, Ohio 43214
(614) 992-1000
(614) 559-6731 (facsimile)
jcamillus@camilluslaw.com

Mitchell Schuster, Esq. (*pro hac vice*
forthcoming)
Benjamin D. Bianco, Esq. (*pro hac vice*
forthcoming)
Meister Seelig & Fein LLP
125 Park Avenue, 7th Floor
New York, New York 10017
(212) 655-3500
(212) 655-3535 (facsimile)
ms@msf-law.com
bdb@msf-law.com

***COUNSEL FOR PLAINTIFF***

## **CERTIFICATE OF SERVICE**

It is hereby certified that a true and correct copy of the foregoing document was filed

via the Court's CM/ECF system on August 25, 2021.


By:     */s/ John C. Camillus*_____
John C. Camillus, Trial Attorney (0077435)
Law Offices of John C. Camillus, LLC
P.O. Box 141410
Columbus, Ohio 43214
(614) 992-1000
(614) 559-6731 (facsimile)
jcamillus@camilluslaw.com

Counsel for Plaintiff